IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| LAWRENCE DIGGS, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. RDB-14-715 |
| BOARD OF EDUCATION | * | |
| OF BALTIMORE COUNTY, | * | |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## AMENDED MEMORANDUM OPINION

Plaintiff Lawrence Diggs ("Plaintiff" or "Diggs") brings this action against Defendant Board of Education of Baltimore County[1] ("Defendant" or "the Board"), alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) et seq. ("Title VII"), age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("the ADEA"), and retaliation on the basis of race and age in violation of Title VII and the ADEA respectively.

Currently pending before this Court is Defendant's Motion for Summary Judgment (ECF No. 25). The parties' submissions have been reviewed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2014).   For the reasons that follow, Defendant's Motion for Summary Judgment (ECF No. 25) is GRANTED.   Judgment is entered in favor of the Board of Education of Baltimore County.

---

[1] Although Plaintiff's Complaint names Baltimore County, Maryland and Kevin Kamenetz, Baltimore County Executive, in his official capacity as defendants, they have since been dismissed from the case (ECF No. 13).

**BACKGROUND**

In ruling on a motion for summary judgment, this Court reviews all facts and reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013). The facts of this case are as follows:

I. Employment History

In May of 2012, Lawrence Diggs ("Plaintiff" or "Diggs") was hired to work as a substitute bus driver for the Board of Education of Baltimore County ("the Board"). Compl. at ¶ 9, ECF No. 1. Diggs is an African American man and was 69 years old at the time of his hiring. *Id.* at ¶¶ 6, 7. Substitute bus drivers serve ten-month terms as at-will employees and earn $11.55 per hour. *Id.* at ¶ 10; Personnel Action Confirmation Form, ECF No. 25-10. Although they may receive long-term assignments, substitute bus drivers are only paid for the hours that they work and are never guaranteed a set number of work hours. Hobbs Aff. at ¶ 9-10, ECF No. 25-8. Furthermore, they are assigned based on the needs of the school system and are not entitled to any specific bus lot or route. *Id.* at ¶ 11.

Diggs was initially assigned to the Providence Bus Lot in Towson, under the direct supervision of Joyce Almond. Almond Aff. at ¶ 3, ECF No. 25-12. His first assignment was Bus 4625. *Id.* at ¶ 4. The bus's permanent driver, Paul Foote, a 50-year old Caucasian male, was out on long-term sick leave. *Id.* The Bus 4625 route included Cromwell Valley Elementary School, which housed the Board's Behavioral Learning Support Program ("BLS

Program"). *Id.* at 5. Students in the program have emotional and/or behavioral disabilities and sometimes act out in offensive or inappropriate ways. *Id.*

In the event a student misbehaves onboard a school bus, the Board instructs its drivers to complete a School Bus Behavior Referral and Feedback Form and submit it to an administrator at the student's school. Mitcherling Aff. at ¶ 6, ECF No. 25-11. School administrators have the sole authority to discipline students, unless the discipline exceeds 10 days, at which time the Board's Superintendent may impose additional discipline. *Id.* at ¶ 7. The Board's Office of Transportation does not become involved in student discipline matters unless a conflict arises between a bus driver and a school administrator. *Id.* at ¶ 8.

Diggs had several issues with student behavior on Bus 4625, beginning in the fall of 2012. Gromek Aff. at ¶ 4, ECF No. 25-13. He reported the issues to Christian Gromek, the Assistant Principal of Cromwell Valley Elementary School, both via the Board's referral form and via informal memoranda. *Id.* at ¶ 4; Referral Forms & Memoranda, ECF No. 25-15. Diggs alleges that no one investigated his complaints. Compl. at ¶ 15, ECF No. 1. However, Ms. Gromek has stated that she investigated each of the incidents reported to her and has imposed appropriate discipline within the parameters set forth by the Board. Gromek Aff. at ¶ 4, ECF No. 25-13. Discipline included referral to Timothy Carr, the behavioral interventionalist for the BLS Program, and requiring that an adult ride on the bus with the students. *Id.*; *See also* Referral Forms & Memoranda, ECF No. 25-15.

Over time, Ms. Gromek grew to believe that Diggs had unrealistic expectations for student behavior on his bus, especially given that many of his students had emotional and/or

behavioral disabilities.  *Id.* at ¶ 6.  Furthermore, she disapproved of how Plaintiff handled student misbehavior.  *Id.* at ¶ 5.  She personally witnessed Diggs publicly berate a student and demand that a behavior interventionalist accompany that student onto the bus.  *Id.* at ¶ 5.  On one occasion, Plaintiff submitted an informal memorandum to Ms. Gromek alleging that a Cromwell Valley student had "assault[ed]" him, striking him in the right shoulder and chest.  *Id.* at ¶ 6.  Plaintiff indicated that he had contacted the police about the 11-year old special needs student and planned to press charges against him.  *Id.*  After investigating this matter, Ms. Gromek concluded that the incident was not nearly as severe as Plaintiff had characterized it and referred the student to Mr. Carr.  *Id.*

Following that incident, Ms. Gromek met with Plaintiff's supervisor, Ms. Almond, to discuss his apparent inability to effectively handle student misbehavior.  Almond Aff. at ¶ 10, ECF No. 25-12.  They then held a meeting with Plaintiff to discuss behavior management strategies he might employ on the bus.  *Id.*  Additionally, Ms. Almond discussed behavior management techniques with Plaintiff, Mr. Carr, and Harvey Weeks, a bus attendant who accompanied Plaintiff on the Cromwell Valley route.  *Id.*  Ultimately, however, Ms. Almond felt she could not teach Diggs to effectively manage Bus 4625.  *Id.*  Therefore, she re-assigned him to Bus 5623 and assigned Sue Miller, a 67-year old Caucasian woman, to Bus 4625, including the Cromwell Valley Elementary route.  *Id.* at ¶ 11.

Although Plaintiff does not deny that he received this route re-assignment, he states in his Complaint that younger, Caucasian drivers were treated preferentially when they faced

4

difficulties with their routes.[2]   Compl. at ¶ 21, ECF No. 1.   While student behavior complaints filed by African American drivers were routinely ignored, claims Diggs, those filed by Caucasian drivers were quickly addressed.  *Id.* at ¶¶ 21-22.  Plaintiff states that he complained to Ms. Almond on February 22, 2013 that she was violating his Title VII rights.[3] *Id.* at 23.  According to Diggs, she replied: "That's your job and you just have to do it. . . . You should be driving senior citizens under different conditions, and not children and youth."  *Id.* at 24.  Diggs claims that the Board continued to ignore his concerns and began assigning him to buses with mechanical problems.  *Id.* at 25.

Plaintiff also complained that several younger, Caucasian drivers had been promoted to permanent positions while he remained a substitute, despite his experience and seniority. Compl. at ¶ 21, ECF No. 1.  According to Plaintiff, he had an excellent attendance record, positive rapport with many students and parents, a good driving record, and maintained his physical fitness to perform his duties.  *Id.* at 29.

Ms. Almond has stated that she intended to promote Plaintiff as soon as he improved his student behavior management skills.  Almond Aff. at ¶ 12, ECF No. 25-12.  In fact, around March 13, 2013, Ms. Almond initiated the process for Plaintiff to be hired as a permanent bus driver.  *See* Request for Personnel Action, ECF No. 25-20.

---

[2] In his affidavit, Diggs states that Michael Murphy, David Crowe, and John Gibbs were Caucasian men hired as substitute bus drivers in 2012.  He claims that they all received route re-assignments after complaining about disorderly students and were all promoted to permanent bus driver positions ahead of him.  Diggs Aff. at ¶¶ 4, 5, & 6, ECF No. 33-1.

[3] Ms. Almond denies that Plaintiff ever complained to her that he was being discriminated against or retaliated against on the basis of his race or age.  Almond Aff. at ¶ 26, ECF No. 25-12.

Diggs' new assignment, Bus 5623, did not service any schools housing students with behavioral and/or emotional disabilities. *Id.* at 11. The permanent bus driver for Bus 5623 was Bob Loss, a 63-year old Caucasian man, who was on leave for medical reasons. *Id.* Before Plaintiff assumed the route, it had been assigned to Nicholas Johnson, a 26-year old African American man. *Id.*

Shortly after he was assigned to Bus 5623, Plaintiff reported several instances of student misbehavior to Dareise Jones, an African American woman and Assistant Principal at Loch Raven Academy. Jones Aff. at ¶¶ 2-4, ECF No. 25-18. Diggs did not always follow procedure when lodging these complaints, but rather submitted oral complaints and informal memoranda. *Id.* at ¶ 4. Additionally, despite Ms. Jones' instructions, Plaintiff frequently addressed students directly about their behavior. *Id.* In Ms. Jones' opinion, Diggs acted very unprofessionally. *Id.* On one occasion, he posted a sign in his bus's window stating, "This Bus Trashed by Loch Raven Academy Kids." *Id.* Nevertheless, Ms. Jones disciplined the Loch Raven Academy students as appropriate, including suspending them from the bus and/or requiring that they serve detention. *Id.*

Around March 18, 2013, a parent of a Loch Raven Academy student confronted Diggs on the bus regarding his alleged conduct toward her child. *See* Compl. at ¶ 26, ECF No. 1. Despite feeling threatened, he did not call 911 on his work-issued phone as he had been trained. Almond Aff. at ¶ 14, ECF No. 25-12. After Diggs complained about the incident, Ms. Almond spoke with Jim Mitcherling, Director of the Board's Office of Transportation, regarding how to handle the issue. *Id.* Mr. Mitcherling suggested that Stacey

Johnson, Principal of Loch Raven Academy, contact the Board's law office to request that a No Trespass letter be issued to the parent. *Id.* However, after learning more about the incident, particularly regarding Diggs' role in the incident, Ms. Almond and Mr. Mitcherling decided that a No Trespass letter would be inappropriate. *Id.* Instead, Ms. Almond scheduled a meeting with the parent and Ms. Jones. *Id.*

Before that meeting took place, Ms. Roney, a Baltimore County Government Personnel Analyst, sent Plaintiff a contingent offer of employment as a permanent bus driver. Offer Letter, ECF No. 25-23. Among other things, the letter required that Plaintiff successfully complete a Pre-Employment Physical ("PEP") as a condition of permanent employment. *Id.* The letter indicated that Plaintiff would "receive notification from Baltimore County Government regarding the date and time of this physical." *Id.* Immediately thereafter, Ms. Jablon, another County employee, scheduled Plaintiff's PEP for April 3, 2013, and informed Ms Roney. *See* Roney & Jablon Emails, ECF No. 25-25.

Around March 22, 2013, Ms. Almond, Ellen Johnson, a 51-year old African American woman and the Routing Assistant for the Providence Lot, and Joseph Bryant, a 58-year old African American man who served as Plaintiff's informal mentor, met with Diggs to discuss his concerns. Almond Aff. ¶ 15, ECF No. 25-12. They discussed the March 18th incident and Ms. Almond encouraged Diggs to have more realistic expectations with regard to teenage student behavior. *Id.* At this time, she retracted her recommendation that Plaintiff receive a permanent position until he took a remedial class on behavior management and improved his performance in that one area. *Id.* On March 25, 2013, Ms.

7

Almond asked Ms. Roney not to move forward with the process of making Diggs a permanent employee.  Roney & Almond Emails, ECF No. 25-26.  Also around this time, Plaintiff claims that Ms. Almond said he was not suited for his job and encouraged him to resign.  Compl. at ¶ 35, ECF No. 1.  According to Ms. Almond, she suggested Plaintiff could resign if he wanted, but in no way attempted to force his resignation.  Almond Aff. at ¶ 15, ECF No. 25-12.

On March 25, 2013, Plaintiff requested that the Loch Raven Academy portion of his route be removed, but that he continue driving students along the rest of the route.  Diggs Mem., ECF No. 25-27.  In that letter, he stated the following:

> Legal issues involving civil and human rights violations and lack of accommodation are in question and possible.  As you are aware, I am a 69-70 year old African American male, semi-retired, married parent and grandparent.  I provide healthcare support for two parents who are both ninety-seven years old.  I also have medical issues germane to an African-American male my age and culture, which can escalate to serious health issues if not contained.  Therefore, I am hoping that you can consider my request for an assignment change from Loch Raven Academy as soon as possible as the stress and tension resulting from this exposure is excessive.

*Id.*

Around March 26, 2013, Ms. Almond and Ms. Jones met with the parent involved in the March 18th incident.  Almond Aff. at ¶ 18, ECF No. 25-12.  Although Diggs was invited to the meeting, he did not attend.  Jones Aff. at ¶ 5, ECF No. 25-18.  At that meeting, Ms. Almond admonished the parent for her behavior and threatened that, if she took similar action again, she would receive a No Trespass letter from the school and might face arrest or prosecution.  Almond Aff. at ¶ 18, ECF No. 25-12.  The Loch Raven Academy School Resource Officer, Greg Suber, an African American male over the age of 40, participated in

8

that meeting and reinforced the consequences that the parent might face.  Suber Aff. at ¶ 4, ECF No. 25-28.

Although bus routes are rarely divided due to the significant logistical and administrative burdens, Ms. Almond granted Plaintiff's request to have a single school, Loch Raven Academy, removed from the Bus 5623 route.  Almond Aff. at ¶ 19, ECF No. 25-12. Ellen Johnson covered Loch Raven Academy with the help of other drivers.  *Id.*  However, it soon became apparent that it was virtually impossible to continue this arrangement.  *Id.* Since Plaintiff still refused to work the Loch Raven Academy portion of the Bus 5623 route, Ms. Almond was forced to remove him from the route.  *Id.*  Since there were no other long-term substitute positions available, Ms. Almond assigned Plaintiff to work as both a bus driver and bus attendant.  *Id.* at ¶ 20.  At all times he was still paid at the higher bus driver rate.  *Id.*

Around April 1, 2013, Ms. Jablon learned that Diggs would be out of town on April 3, 2013, so she rescheduled his PEP appointment for April 18, 2013.  Roney & Jablon Emails, ECF No. 25-25.  On April 16, 2013 Ms. Almond informed Ms. Roney that Plaintiff had completed additional behavior management classes and that she would re-evaluate him for permanent employment after a couple of months.  Roney & Almond Emails, ECF No. 25-31.  On April 18, 2013, Plaintiff finally attended his PEP appointment, and his examiners at Mercy Hospital required that he provide additional information relating to sleep apnea before he could pass the PEP.  *See* Medical Exam. Rpt., ECF No. 25-32.  Plaintiff failed to submit the required documents, and Ms. Jablon closed his file.  *See* Roney & Jablon Emails,

ECF No. 25-25.  In May of 2013, Plaintiff requested a lot transfer, identifying the Kenwood Lot as his first choice.  *See* Transfer Request, ECF No. 25-34.

Around June 10, 2013, Plaintiff alerted Ms. Almond and Ms. Jones of a "bus riot" that had occurred while Plaintiff was subbing for the Loch Raven Academy route.  June 10, 2013 Mem., ECF No. 25-35.  Plaintiff alleged that the students became unruly and that one of them threw an object at his back.  *Id.*  The situation became so extreme that Diggs called 911 and Officer Stuber escorted the bus for the remainder of the ride.  *Id.*  Ms. Jones and Officer Stuber sternly addressed the students on the next day of school.  *Id.*  However, in his Complaint, Plaintiff alleges that there was no follow up.  Compl. at ¶ 44, ECF No. 1.

Throughout the summer of 2013, Diggs continued to work as a substitute driver at the Providence Lot.  Almond Aff. at ¶ 21, ECF No. 25-12.  Generally, Ms. Almond recommends that the Board promote substitute bus drivers to permanent positions in order of seniority.  *Id.* at ¶ 22.  However, around this time, Ms. Almond recommended to the Human Resources Department that several substitute bus drivers be promoted over Plaintiff because they did not have consistent behavior management issues.  *Id.*  Ms. Almond had done this with other substitute bus drivers in the past.  *Id.* at ¶ 23.  On one occasion, Ms. Almond passed over a Caucasian substitute several times due to poor attendance.  *Id.*

By June 20, 2013, Plaintiff had not submitted the required sleep apnea testing results, so his file was closed for a second time.  *See* Roney & Almond Emails, ECF No. 25-26.  Ms. Hobbs attempted to contact Diggs, but the telephone number on file for him was invalid. Hobbs Aff. at ¶ 13, ECF No. 25-8.

10

On August 23, 2013, Mr. Mitcherling granted Diggs' request for a transfer to the Kenwood Lot.  Request for Personnel Action, ECF No. 25-37.  After Plaintiff transferred to the Kenwood Lot, Ms. Almond had no contact with him and no authority over him. Almond Aff. at ¶ 24, ECF No. 25-12.  Plaintiff's supervisor at the Kenwood lot was Mervin Mawhinney.  Mawhinney Aff. at ¶ 4, ECF No. 25-38.

On August 28, 2013, Ms. Roney informed Mr. Mawhiney that Plaintiff had not been cleared by his medical examiners at Mercy because he had failed to submit information related to sleep apnea. Roney & Mawhinney Emails, ECF No. 25-40.  Ms. Roney asked Ms. Hobbs if Plaintiff could continue to work, even though he had not completed his PEP, because his certification had not expired.  Roney & Hobbs Emails, ECF No. 25-40.   Ms. Hobbs responded that "Mr. Diggs began the process at Mercy; therefore, he must complete the process." *Id.*

Ultimately, Diggs was not permitted to continue working as a substitute bus driver because he had failed to follow up with Mercy regarding his sleep apnea, and therefore the Office of Transportation had doubts as to whether Plaintiff could safely perform the essential functions of his position.  Mitcherling Aff. at ¶ 11, ECF No. 25-11.  The ability to "safely pick up, transport, and discharge students and staff" is an essential function of the Board's bus drivers.  *See* Typical Duties – School Bus Driver, ECF No. 25-4.  Additionally, under Board rules, drivers "must be physically qualified to operate a commercial motor vehicle in accordance with Federal Motor Carrier Safety Administration regulations and must remain physically qualified to operate such vehicles throughout their employment." *Id.*

11

Federal regulations provide that "[a] person is physically qualified to drive a commercial motor vehicle if that person has no established medical history or clinical diagnosis of a respiratory dysfunction likely to interfere with his/her ability to control and drive a commercial motor vehicle safely."  49 C.F.R. § 391.41(b)(5).

Since Diggs was a part-time, hourly employee, he was not paid when he did not work. Mitcherling Aff. ¶ 12, ECF No. 25-11.  Around September 4, 2013, Ms. Hobbs informed him that he was not eligible to work until he was cleared by Mercy and that, because he was an hourly employee, he would not be paid until then.  Hobbs Aff. at ¶ 17, ECF No. 25-8. Diggs alleges that on December 27, 2013, he was informed that he had been terminated. Compl. at 57, ECF No. 1.  However, Ms. Hobbs denies telling him anything of the sort. Hobbs Aff. at ¶ 21, ECF No. 25-8.

Around January 5, 2014, Plaintiff filed for unemployment insurance benefits with the Maryland Department of Labor, Licensing, and Regulation ("DLLR").  *See* Request for Separation Information, ECF No. 25-42.  Ms. Roney informed Carol Stroud, the Board's agent to DLLR for unemployment insurance purposes, that Plaintiff had not passed a physical exam.  *See* Roney Email, ECF No. 25-43.  Ms. Stround then informed DLLR that Plaintiff had been "Discharged-No Misconduct.  Not able to pass physical."  DLLR Fax, ECF No. 25-44.  On January 29, 2014, DLLR awarded Plaintiff unemployment benefits.  *See* Not. Of Benefit Determination, ECF No. 25-45.

On January 27, 2014, Ms. Hobbs obtained confirmation that Plaintiff had been cleared by his examiners at Mercy.  Hobbs Aff. at ¶ 22, ECF No. 25-8.  That month, Ms.

Almond received notification that Plaintiff had cleared his PEP.  Almond Aff. at ¶ 25, ECF No. 25-12.  However, no one at Plaintiff's new lot—the Kenwood Lot—was informed.  Mawhinney Aff. at ¶ 6, ECF No. 25-38.  Therefore, no one informed Plaintiff that he was permitted to return to work.  *Id.*

On June 2, 2014, Dr. Lisa Grillo, then Chief Human Resources Officer, sent a "Reasonable Assurances" letter to a variety of temporary Board employees, including Plaintiff, requesting their services during the upcoming school year.  *See* Reasonable Assurances Letter, ECF No. 25-48; Reasonable Assurances Letter Recipients, ECF No. 25-49.  The letter requested that those individuals not planning to return to work call the Human Resources Department.  *Id.*  Plaintiff received this letter because he was on the Board's active employee roster.  Roney Aff. at ¶ 6, ECF No. 25-24.  He had never been taken off of that roster since he began work in 2012.  *Id.*  On August 5, 2014, Dr. John Mayo, the current Chief Human Resources Officer, sent Plaintiff a letter informing him that the Board had not received his response to the Reasonable Assurances Letter.  *See* Mayo Letter, ECF No. 25-50.  He requested that Plaintiff respond to his letter in order to remain on the roster.  *Id.*  As of October of 2014, Dr. Mayo had not received a response.  Mayo Aff. at ¶ 3, ECF No. 25-51.

II.   Procedural History

On April 29, 2013, the Board's Office of Internal Audits received a report that an anonymous call had been made to the office's hotline.  *See* EthicsPoint Case 2013-63, ECF No. 25-57.  The caller alleged that several bus drivers and bus attendants had been attacked

by students over the past year; that Ms. Almond asked the caller not to report the incidents; that Ms. Almond had "failed to take any action to remedy the violent situation;" and that bus drivers and bus attendants who had reported the incidents to Ms. Almond "received disciplinary action as a result of the attacks they suffered." *Id.* The caller also reported that the previous month he "witnessed" a parent board a bus, and that the caller suspected that the parent was carrying a gun because she was a retired police officer. *Id.* Although the caller alleged that "due process of administrative action was not followed," the caller did not allege that he/she or other drivers or attendants were being discriminated against or retaliated against based upon their age, race, or any other protected classifications. *Id.*

Around May 15, 2013, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging race and age discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("the ADEA"). *See* Charge of Discrimination, ECF No. 25-58.  He alleged that in February of 2013, he "admonished" Ms. Almond that she had violated Title VII and the ADEA by allegedly "permitt[ing] white school bus drivers to refuse to drive dangerous routes with violent students, and they were reassigned to other bus routes expeditiously," and that thereafter Ms. Almond "started harassing [him] and creating an uncomfortable work environment by frequently changing [his] assignment and requiring [him] to work extra hours for which [he was] not paid. *Id.* Plaintiff further alleged that Ms. Almond retaliated against him in March of 2013 by

"removing [him] from Bus Driver position, denying [his] promotion and demoting [him] to School Bus Attendant position." *Id.*

After this charge was raised, the Board's Equal Employment Opportunity ("EEO") Office began investigating Plaintiff's case as well as the issues raised in the anonymous phone call. Barber Aff. at ¶ 5, ECF No. 25-53. On or around October 11, 2013, the Office of Internal Audits received notice of a second anonymous call similar in substance to the first, although this call included a callback number. *See* EthicsPoint Case 2014-031, ECF No. 25-59. On October 15, 2013, Plaintiff sent a letter to Board Superintendent Dallas Dance, alleging discrimination on the basis of race, age, and disability and requesting that an investigation be conducted. *See* Request for Service, ECF No. 25-60. Dr. Dance requested that James Mitcherling, Director of Transportation, review and respond to the letter. *Id.*

On October 18, 2013, Andrea Jamison, an Auditor employed by the Board, called the phone number identified in the second anonymous call. *See* Diggs Interview, ECF No. 25-59. Ms. Jamison spoke to Diggs, who confirmed that he had made both anonymous calls. *Id.* Subsequently, Plaintiff contacted Mr. Mitcherling, who informed him that he could not discuss the matter with him and that all further inquiries should be made through the EEO office. Mitcherling Letter, ECF No. 25-61.

The EEOC denied Diggs' complaint and, on December 13, 2013, issued him a Notice of Right to Sue letter, thus terminating the EEOC's investigation of his charge. Notice of Right to Sue, ECF No. 25-62. On December 30, 2013, Plaintiff filed another

15

charge with the EEOC, this time alleging that he had been terminated in retaliation for having filed his initial charge in May 2013.  Charge of Discrimination, ECF No. 25-63.

Around March 20, 2014, Plaintiff filed a Complaint with the United States Department of Education, Office of Civil Rights, alleging race and age discrimination.  *See* U.S. Dept. Ed. Letter, ECF No. 25-64.  The Department's Office of Civil Rights referred the claim to the EEOC.  *Id.*  On August 11, 2014, the EEOC once again rejected Diggs' complaint issued a Notice of Right to Sue with regard to his second claim. Notice of Right to Sue, ECF No. 25-65.

Indeed, Diggs filed the subject Complaint (ECF No. 1) in this action before receiving his second rejection by the EEOC.  In this case, he alleges race discrimination in violation of Title VII, age discrimination in violation of the ADEA, and retaliation on the basis of race and age in violation of Title VII and the ADEA respectively. After a six-month period of discovery, the Board filed the subject Motion for Summary Judgment (ECF No. 25).

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  When considering a motion for summary judgment, a judge's

function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial.  *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993).  If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted.  *Anderson*, 477 U.S. at 249-50.  On the other hand, a party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).  This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences."  *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

## ANALYSIS

I.    Race and Age Discrimination Claims

Plaintiff alleges that the Board discriminated against him on the basis of his race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) et seq. ("Title VII"), and on the basis of his age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("the ADEA").  Compl. at ¶¶ 62-76, ECF No. 1. Specifically, he claims that the Board demoted him in March of 2013, suspended him in

17

August of 2013, and discharged him in December of 2013 because he is an African American man over the age of forty. *Id.*

Generally speaking, a plaintiff may avert summary judgment and establish a claim of intentional discrimination using "ordinary principles of proof by any direct or indirect evidence relevant to and sufficiently probative of the issue." *EEOC v. Western Elec. Co., Inc.*, 713 F.2d 1011, 1014 (4th Cir. 1983). Alternatively, a plaintiff may proceed under the proof scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its progeny, under which the employee, after establishing a *prima facie* case of discrimination, must demonstrate that the employer's proffered nondiscriminatory reason for the challenged employment action is in fact a pretext for discrimination. *Id.* Here, Plaintiff has not presented direct evidence of discrimination. In fact, despite having been afforded full discovery, he has produced nothing more than his own affidavit. Diggs Aff., ECF No. 33-1. "A plaintiff's own self-serving opinions, absent anything more, are insufficient to establish a *prima facie* case of discrimination." *Mackey v. Shalala*, 360 F.3d 463, 469–70 (4th Cir. 2004). Therefore, this Court assesses his claims under the *McDonnell Douglas* burden-shifting test.

Under the *McDonnell Douglas* test, a plaintiff must first present enough evidence to make a *prima facie* case of discrimination. *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 142–43 (2000). Although *McDonnell Douglas* was a Title VII case, the Fourth Circuit has consistently applied the *McDonnell Douglas* burden-shifting test to ADEA claims. *See Mitchell v. Data General Corp.*, 12 F.3d 1310, 1314 (4th Cir. 1993) ("The burden of proof of an age discrimination claim may be satisfied, as with other types of discrimination claims, by direct

evidence or by circumstantial evidence under a method of proof established by *McDonnell Douglas . . .*).  To establish a *prima facie* case of discrimination under Title VII or the ADEA, plaintiffs must show that they: (1) are members of a protected class; (2) suffered an adverse employment action; (3) were at the time performing their job duties at a level that met their employer's legitimate expectations; and (4) the position remained open or was filled by a similarly qualified applicant outside the protected class. *See e.g., Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir. 2005) (Title VII); *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (age).

Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to produce evidence that the adverse employment actions were taken against the plaintiff "for a legitimate, nondiscriminatory reason." *Id.* at 142 (citing *Tex. Dept. Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). Finally, the plaintiff is "afforded the 'opportunity to prove by a preponderance of evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.' " *Id.* (quoting *Burdine*, 450 U.S. at 253).

The Defendant does not dispute that Plaintiff is a member of two protected classes. Diggs is an African American man and was over the age of 40 at the time of his employment with the Board.  However, in its Motion for Summary Judgment (ECF No. 24), the Board denies that it took any adverse employment action against Plaintiff and, even if it did, that Plaintiff's job performance was not meeting the Board's legitimate expectations at that time. Mot. Summ. J. p. 40, ECF No. 24.

A.      No Adverse Employment Action

Plaintiff claims that he suffered adverse employment action when the Board demoted him in March of 2013, suspended him in August of 2013, and discharged him in December of 2013.  Compl. at ¶¶ 62-76, ECF No. 1.

        i.      March of 2013

Plaintiff claims that the Board demoted him when Ms. Almond assigned him to the dual role of Bus Driver and Bus Attendant in March of 2013.  In fact, the undisputed facts in this case indicate that this was an accommodation and not a demotion.  By March of 2013, Plaintiff had already been transferred twice, at his own request.  First, he was taken off of the Bus 4625 route and reassigned to Bus 5623 because of his difficulty managing the students in Cromwell Valley Elementary's Behavioral Learning Support program.  Then, following a dispute with the parent of a Loch Raven Academy student, Plaintiff was permitted to remove that school from his route.  According to Ms. Almond, dividing a route as Plaintiff was permitted to do is very rare because of the administrative and logistical confusion it creates.  However, this special accommodation was made for Plaintiff's comfort.

The "demotion" Plaintiff refers to occurred because the Board could no longer feasibly maintain Plaintiff's special accommodation.  Other drivers on the lot had been taking turns covering the Loch Raven Academy stops abandoned by Plaintiff, but it became virtually impossible for them to continue.  Almond Aff. at ¶ 19, ECF No. 25-12.  So, in March of 2013, Ms. Almond was forced to remove Plaintiff from the Bus 5623 route and

20

give the entire route, including Loch Raven Academy, to one driver. *Id.* As there were no other long-term substitute positions available at that time, Ms. Almond assigned Plaintiff to work as a Bus Driver and Bus Assistant so that he could maintain his hours. At all times, he was paid at the higher Bus Driver salary. *Id.* at 20.

Rather than being a demotion, this was a very generous accommodation to Plaintiff, especially given that Ms. Almond had re-arranged his schedule twice before. Accordingly, the Plaintiff's re-assignment was not an adverse employment action.

        ii.      <u>August of 2013</u>

Plaintiff claims that the Board suspended him from work in August of 2013 when they insisted that he not drive until he supplied Mercy with the follow-up material they requested on his possible sleep apnea. However, the record indicates that any period of work Plaintiff missed for failing to follow up with Mercy was not a suspension, but a break in employment caused by Plaintiff's own failure to comply with Board policies.

Following Plaintiff's offer of permanent employment in March of 2013, he was required to undergo a Pre-Employment Physical ("PEP"). On April 18, 2013, Diggs attended his PEP appointment at Mercy Hospital, and was required to provide additional information related to sleep apnea before he could pass the PEP. Plaintiff failed to follow up as required, despite several reminders. Concerned for student safety, Diggs' supervisors at the Kenwood Lot refused to let him drive, even as a substitute, until he provided follow-up information on his condition.

In his Response to Defendant's Motion for Summary Judgment, Diggs alleges that he

21

was not required, as a temporary bus driver, to complete the PEP.  *See* Response Mot. Summ. J., p. 7, ECF No. 33.  Therefore, he argues, the Board's prohibiting him from driving was not a mandated health and safety measure, but a suspension.  While Diggs is correct that a PEP is not required of substitute drivers, he still underwent a PEP and the results of that exam were reported back to the Board, raising red flags that he might suffer from sleep apnea.  Therefore, according to Board policies and federal regulations, he could not drive until it was confirmed that he could safely operate a vehicle.  The facts before this Court demonstrate that the Board did not intend for Diggs to stop driving.  For example, he was never removed from the Board's roster of active employees.  However, as an hourly employee, he would not be paid until he completed the sleep apnea follow up and began driving again.

Accordingly, Diggs did not suffer an adverse employment action in August of 2013, but rather, failed to meet the requirements of his employment, preventing the Board from giving him route assignments.

     iii.     <u>December of 2013</u>

Plaintiff alleges that he was discharged in December of 2013.  However, the record reflects that he remained a Board employee through the end of that year.  The record also indicates that he was not working initially because of his own failure to complete the required sleep apnea follow up and later because of miscommunication between departments at the Board.

Plaintiff alleges that a Human Resources representative from the Board informed him

in December of 2013 that he had been terminated.  However Ms. Hobbs, who spoke to Plaintiff that month, denies that she said anything of the sort.  Hobbs Aff. at ¶ 21, ECF No. 25-8.  Rather, she told Diggs that he could not work because he had not cleared his PEP.  *Id.*

After Plaintiff completed the sleep apnea follow-up, satisfying his PEP requirement, it is clear that the Board expected him to return to work.  In January of 2014, Ms. Almond was informed that Plaintiff had completed the PEP and was now cleared to drive.  However, due to miscommunication at the Board, word never reached Plaintiff's new supervisors at the Kenwood Lot, and Plaintiff was not informed.

Plaintiff's receipt of unemployment benefits was the result of administrative error.  During all of 2013, he remained on the Board's active employee lists.  Roney Aff. at ¶ 6, ECF No. 25-24.  In fact, in June of 2014, the Board sent Plaintiff a "Reasonable Assurances" letter.  That letter went to all employees on the Board's active employee roster, and it requested their service for the upcoming school year.

Because Plaintiff was never discharged from his position with the Board and remained an active employee with the Board through 2014, he suffered no adverse employment action in December of 2013.

B.    Legitimate Non-Discriminatory Rationale

Even if Plaintiff could be said to have suffered an adverse employment action, the Board has satisfied its burden of articulating a legitimate, nondiscriminatory reason for taking such action.  As explained *supra*, the Board had legitimate concerns that Plaintiff could not safely operate a school bus.  The ability to "safely pick up, transport, and discharge

students and staff" is an essential function of the Board's bus drivers.  *See* Typical Duties –
School Bus Driver, ECF No. 25-4.   Additionally, under Board rules, drivers "must be
physically qualified to operate a commercial motor vehicle in accordance with Federal Motor
Carrier Safety Administration regulations and must remain physically qualified to operate
such vehicles throughout their employment."   *Id.*   Federal regulations provide that "[a]
person is physically qualified to drive a commercial motor vehicle if that person has no
established medical history or clinical diagnosis of a respiratory dysfunction likely to interfere
with his/her ability to control and drive a commercial motor vehicle safely."   49 C.F.R. §
391.41(b)(5).   By failing to follow up with a sleep apnea specialist after his examiners at
Mercy stated that he should, Diggs failed to comply with the Board's safety requirements.

Furthermore, Plaintiff has failed to demonstrate that the Board's reason for any
adverse action it may have taken was pre-textual and that race or age-based discrimination
was the real reason.   Although Diggs has broadly claimed that younger, Caucasian drivers
were given preferential treatment by the Board, he has failed to demonstrate, or even allege,
that younger or Caucasian temporary bus drivers who were referred to sleep apnea specialists
were allowed to continue driving while the Board awaited the results of their sleep apnea
testing.

Finally, of the fourteen people Plaintiff identifies as having participated in the alleged
discrimination, eleven are older than 40 years of age, half are African American, and all are
either African American or over the age of 40.   While this fact is not dispositive of the issue
at hand, it does "suggest[] no discriminatory motivation."   *Demesme v. Montgomery County Gov't,*

63 F. Supp. 2d 678, 683 (D. Md. 1999).

Accordingly, Defendant is entitled to judgment as a matter of law with respect to Plaintiff's claims of race and age-based discrimination.

## II.    Hostile Work Environment Claims

Plaintiff alleges that the Board created a hostile work environment by ignoring his complaints about hazardous conditions on his bus routes, while re-assigning younger, Caucasian bus drivers to more favorable routes when they made similar complaints, and demoting him in March of 2013 for expressing concern about these alleged discriminatory practices.[4]  Compl., p. 11-12, ECF No. 1.  In its Motion for Summary Judgment (ECF No. 24), the Board presents undisputed evidence that Plaintiff's complaints were addressed, reveals that he was not demoted, but rather given an accommodation, in March of 2013, and contends that no evidence suggests white bus drivers were treated preferentially.

To establish a *prima facie* case of race or age-based hostile work environment, Plaintiff must demonstrate that: "(1) the harassment was unwelcome; (2) the harassment was based on his race or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir.1998).

Far from being ignored, Diggs' complaints were addressed by many individuals, at many different levels of Board leadership.  Ms. Gromek, Assistant Principal at Cromwell Valley Elementary School, has testified that she investigated each of Plaintiff's complaints

---

[4] As discussed *supra*, Plaintiff's re-assignment in March of 2013 cannot be said to have been an adverse employment action.

about the behavior of Cromwell Valley students, even those filed informally, and imposed appropriate discipline in each case.  *See* Gromek Aff. at ¶ 4, ECF No. 25-13.  In at least one case, Ms. Gromek referred a student to Mr. Timothy Carr, a behavior interventionalist, and requested that an adult ride with the students on Plaintiff's bus.  *Id.*  In fact, Ms. Gromek met with Plaintiff and his supervisor, Ms. Almond, to discuss ways that Plaintiff might more effectively control the behavior of students on his bus.  *Id.* at ¶ 7.  Additionally, Ms. Almond held a separate meeting with Plaintiff, Mr. Carr, and Mr. Harvey Weeks, a bus attendant who rode with Plaintiff.  *Id.* at ¶ 10.

Most importantly, Ms. Almond reassigned Plaintiff to another bus that did not serve any students with behavioral and/or emotional disabilities.  When Plaintiff encountered a problem with the parent of a Lock Raven Academy student on his new route, Ms. Almond promptly referred the issue to Jim Mitcherling, Director of the Board's Office of Transportation, who then directed her to the Board's law office to request that a No Trespass letter be issued to the parent.  Almond Aff. at ¶14, ECF No. 25-12.  After reviewing the incident, Ms. Almond and her superiors opted not to issue the letter, although she did speak with the parent personally about the inappropriateness of her behavior and held another meeting with Plaintiff to discuss his concerns.  *Id.* at 15, 18.  When Plaintiff remained dissatisfied with his route, Ms. Almond removed Loch Raven academy from his route, although this is rarely done do to the "significant administrative and logistical challenges it creates."  *Id.* at ¶19.

Even if Diggs has demonstrated that the Board was in some way deficient in its

26

handling of his complaints, there is no evidence, aside from Plaintiff's bald speculation, to suggest that the Board treated younger or Caucasian employees preferentially or assigned them to better bus routes. "A plaintiff's own self-serving opinions, absent anything more, are insufficient to establish a *prima facie* case of discrimination." *Mackey*, 360 F.3d at 469–70.

Contrary to Plaintiff's allegations, the Bus 4625 route to which he objected was assigned to a Caucasian man before it went to him and a Caucasian female drove the route after Plaintiff was transferred off of it. Furthermore, a Caucasian driver took over the Bus 5623 route, including the Lock Raven Academy stops that Plaintiff feared, after Plaintiff was transferred off of it. Additionally, the permanent driver for that route, whom Plaintiff initially replaced, was a Caucasian man.

Plaintiff further alleges that Ms. Almond harassed him personally, commenting on one occasion that "[y]ou should be driving senior citizens under different conditions, and not children and youth." Compl. at ¶ 21-22, ECF No. 1. However, this statement makes no reference to Plaintiff's age or race and therefore does not establish that the harassment was motivated by those factors. Furthermore, Diggs has alleged that Ms. Almond harassed almost everyone on the lot, regardless of race or age. *See* Plaintiff's Interrog. 1.1-1.7, ECF No. 25-68. Finally, Plaintiff alleges that the Board assigned him to buses with mechanical difficulties. There is no evidence, aside from Plaintiff's own affidavit, to support this claim. Even if there were, Plaintiff has offered no evidence to suggest that younger, Caucasian employees were given better buses. For these reasons, the Defendant is entitled to judgment as a matter of law with respect to Plaintiff's hostile work environment claims.

27

III.   Retaliation Claims

Plaintiff alleges that the Board retaliated against him when he "complained of preferential treatment given to younger white employees in the form of route assignments when they complained about hazardous conditions from September 2012 through August 2013.   Compl. at ¶ 13, ECF No. 1.   Specifically, after he complained about preferential treatment in February 2013, the Board "continued to assign Plaintiff to dangerous bus routes, demoted him to a Bus Attendant, denied him the ability to become a Permanent Bus Driver, unfairly suspended him in August 2013, and ultimately terminated him from employment in December 2013."   *Id.*

In order to establish a *prima facie* case of retaliation under Title VII or the ADEA, plaintiff must show (1) that he engaged in a protected activity, (2) that his employer took an adverse employment action against him and (3) that a causal connection existed between the activity and the adverse action.   *Cepada v. Bd. of Educ. of Baltimore Cnty.*, 814 F.Supp.2d 500, 514 (D. Md. 2011) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006); *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543 (4th Cir. 2003)).

In support of its Motion for Summary Judgment, the Board denies that Plaintiff ever complained to his supervisor about alleged racial or age-based discrimination and that, even if he did, he did not suffer adverse employment action.   In her affidavit, Ms. Almond states that Plaintiff did not say anything to her about the discriminatory treatment he allegedly

28

experienced.   Plaintiff did send a letter to his Routing Supervisor in March of 2013 requesting a re-assignment off of the Loch Raven Academy route on account of "medical issues germane to an African American male of [his] age." *See* Diggs Mem., ECF No. 25-27. He further stated that "[l]egal issues involving civil and human rights violations and lack of accommodation are in question," although he did not specifically raise any claims of discrimination." *Id.*

Even if Diggs did engage in protected activity by raising a discrimination claim, he did not suffer an adverse employment action and has not shown that he was systematically assigned to more dangerous routes than his younger, Caucasian counterparts. *See* discussion *infra*.  As a result, the Defendant is entitled to judgment as a matter of law with respect to Plaintiff's retaliation claims.

## CONCLUSION

For the reasons stated above, Defendant Board of Education of Baltimore County's Motion for Summary Judgment (ECF No. 25) is GRANTED and Judgment is entered for the Defendant.

A separate Order and Judgment follows.


Dated: September 23, 2015                    _/s/_____
                                             Richard D. Bennett
                                             United States District Judge